Wachovia Bank and Trust Company and Fred J. Stanback, Trustees Under Agreement with Thomas M. Stanback for Ada M. Stanback, Thomas M. Stanback, Jr., and William Charles Stanback; Wachovia Bank and Trust Company and Thomas M. Stanback, Trustees Under Agreement with Fred J. Stanback for Elizabeth C. Stanback, Fred J. Stanback, Jr., and Nancy Jean Stanback; Fred J. Stanback and Thomas M. Stanback v. Commissioner.
Wachovia Bank & Trust Co. v. Commissioner
Docket Nos. 1899, 1900, 1901, 1902.
United States Tax Court
1944 Tax Ct. Memo LEXIS 195; 3 T.C.M. (CCH) 595; T.C.M. (RIA) 44217; June 22, 1944
*195 R. C. Vaughn, Esq., and H. G. Hudson, Esq., 610 Reynolds Bldg., Winston-Salem, N.C., for petitioners. L. W. Creason, Esq., for respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: This is a consolidated proceeding involving income tax deficiencies as follows: Taxpayer
Docket No.
Year
Deficiency
Thomas M. Stanback Trust
1899
1938
$ 1,366.18
1939
5,007.20
Fred J. Stanback Trust
1900
1938
1,366.18
1939
5,007.20
Fred J. Stanback
1901
1938
4,931.99
1939
15,314.73
Thomas M. Stanback
1902
1939
18,203.31
The question common to Docket Nos. 1901 and 1902 is whether income from certain trusts is taxable to the respective grantors pursuant to sections 22(a) or 167(a) of the Revenue Act of 1938 and the Internal Revenue Code. The deficiencies in Docket Nos. 1899 and 1900 are based upon the same income and were determined "in order to protect the interests of the government in the event it should be held ultimately that the trust income is not taxable to the grantor." If respondent prevails in the cases concerning the grantors, then it is admitted that decisions of "no deficiency" should be entered in the trust cases. However, if the petitioners-grantors *196 prevail in Docket Nos. 1901 and 1902, then the issue raised in the trust cases becomes material and must be decided. It is whether Thomas M. Stanback and Fred J. Stanback each created one trust or three trusts by trust agreements executed on December 28, 1937. In Docket No. 1901 petitioner concedes that his net income for the year 1937 as reported should be increased by $158.34. In Docket No. 1902 petitioner concedes that his net income as reported should be increased by $262.50. Effect will be given to these concessions in the recomputation under Rule 50. No returns were filed by the trustees in Docket Nos. 1899 and 1900, respectively, as trustees of a single trust. The trustees did file returns with the collector for the district of North Carolina at Greensboro as trustees each of three separate trusts. The petitioners in Docket Nos. 1901 and 1902 filed their individual income tax returns with the same collector. In all cases accounts were kept and the returns were filed on the cash receipts and disbursements basis. Findings of Fact Thomas M. Stanback and Fred J. Stanback are brothers. In 1924 they became partners in the business of manufacturing and selling headache powders, *197 a business which theretofore had been carried on by Thomas individually. Under their agreement Thomas received a 2% royalty on the net sales as compensation for formulas, trade name and good will turned over to the partnership. Otherwise the profits were divided equally. By the middle 1930s the business, conducted under the name of Stanback Company, was in most favorable circumstances. It was free of debt, had cash in the bank, and substantial accounts receivable and the income which it was producing was in excess of the needs of the Stanback brothers. Surpluses had been invested in securities and real estate. The brothers believed this to be a propitious time to place their families in a financial position free of the hazards of the proprietary medicine business and the possible exercise of poor judgment on their own part. They considered incorporating the business, but were fearful of the impact of possible franchise taxes in the many states in which the Stanback Company was doing business. They also considered making outright gifts of partnership interests to their wives and children. However, they were reluctant to give their wives such complete independence and the minority *198 of the children made this procedure questionable legally under North Carolina partnership law. It finally was decided, after numerous conferences with their attorneys, that their objectives, including the desire to minimize taxes, could best be accomplished by the adoption of a plan embracing the creation of a trust for each wife and child, a corporation and a limited partnership. To this end they caused the transactions hereinafter described to take place. On December 21, 1937 The Stanco Realty Company, hereinafter called "Stanco", was incorporated under the laws of North Carolina. Its authorized capital stock was 3000 shares without par value. The Stanback brothers and their respective wives each subscribed for one share of stock and this sufficed to complete the corporation's organization, and to entitle it to begin business. It was planned that Stanco should take over the real estate and investment holdings of the Stanback Company partnership. On December 27, 1937, the Stanbacks deeded to Stanco sixteen tracts of real estate and sold to it by bills of sale various stocks and bonds, all of which property had theretofore been held by the partnership. In exchange for such property *199 Thomas and Fred each received 600 shares of Stanco's capital stock. Thomas and Fred each executed a trust agreement on December 28, 1937. They were advised by their attorney that each instrument created three trusts. The agreements were in all material respects the same except for the beneficiaries and the individual trustee. Each agreement provided that "the trusts herein created and established shall be administered for the benefit of the grantor's wife and children, and for the benefit of their successors as hereinafter provided and directed." Thomas' wife was Ada M. and his children were Thomas Jr., age 18, and William C., age 15. Fred's wife was Elizabeth C. and his children were Fred Jr., age 8, and Nancy Jean, age 1. Each brother was appointed as the individual cotrustee under the other's trust agreement. The corporate co-trustee appointed under both agreements was the Wachovia Bank and Trust Company, sometimes hereinafter referred to as the "Bank". The grantors each conveyed to the trustees, by written instrument duly acknowledged, an undivided 24% of his undivided 50% interest in the partnership of Stanback Company, being an undivided 12% interest in the assets, properties, *200 capital and good will of the partnership. The trustees were given the power to deal with the properties conveyed and additions thereto "as they in their discretion shall deem to be for the best interests of the beneficiaries hereunder to the same extent that the Grantor, himself, might or could have done had no trust been impressed thereon." The grantor expressly authorized and recommended the retention of the undivided interest in the Stanback Company, but permitted its disposal in all or part if such should at any time appear to be for the best interests of the trust estate. Without limiting the trustees' powers, they were authorized to sell or exchange any part of the estate; acquire properties from the grantor; participate in financial readjustments in any business or corporation in which the trust estate was financially interested; determine what was principal and what was income; divide or allot the trust estate in kind or in money; invest and reinvest funds without being restricted to statutory securities; borrow; compromise; and execute legal instruments required in the businesslike administration of the trust. The trustees were made liable for acts of bad faith, negligence *201 or wrongdoing, but not for errors of judgment. It was recited that the partnership interest was conveyed to the trustees with the definite understanding that the Stanback Company business was to be operated, controlled, managed and disposed of in accordance with the Articles of Copartnership which the trustees were expressly authorized to execute in their fiduciary capacity. The trustees were directed to "forthwith divide this trust estate into equal parts or shares," one share to be held for the benefit of the grantor's wife and one for each of his two children. Any children born on or before December 31, 1949 were to be admitted "to the class of beneficiaries" to share equally with the others. The net income available for distribution from the wife's share was to be paid to her as she should direct. In the absence of such direction within 12 months of the receipt of income by the trustees, the income was to be added to the principal of her share. The trust as to the wife's share was to terminate at her death or before, should she sue grantor for divorce or separation, whereupon her share was to be merged with those held for the benefit of the grantor's children. The net income *202 available for distribution from each child's share during his minority could be applied for his benefit in such manner, at such intervals and in such amounts as the trustees in their discretion deemed advisable and for the best interests of the child. In the alternative, the trustees could pay all or any portion of such income to the child's mother to be by her used and applied for the child's benefit as she should deem advisable, unless the mother should sue the grantor for divorce or remarry, in either of which circumstances the mother was to have no voice in the matter. Income not applied as aforesaid was to accumulate and be added to the principal of the share held for the child's benefit. Discretionary authority was given the trustees to invade corpus in the following language: "If by reason of serious illness or misfortune or other emergency - as to the existence of which the Trustees shall be the sole judge - the net income payable to or applicable for the benefit of any beneficiary under the terms of this agreement, supplemented by income avail able from other sources to such beneficiary shall not be sufficient, in the judgment of the Trustees, adequately to meet the reasonable *203 needs of such beneficiary in his or her station in life, then, and in that event, the Trustees are authorized, in the exercise of their sole discretion, to apply so much of such beneficiary's part or share of the principal of the trust estate as the Trustees shall deem necessary to meet the reasonable needs of such beneficiary in his or her, station in life. The exercise by the Trustees of the discretion herein conferred upon them shall be conclusive and binding upon everyone interested in this trust estate." Upon each child becoming 21 the income from his share was to be paid over to him currently with one-fourth of the principal and accumulations to be distributed free of the trust when the child reached 25, one-third of the remainder when he reached 30, and the balance when he reached 35 unless the child had by then demonstrated an incapacity to manage and conserve the portions theretofore received in which case the trustees, in their discretion, could continue the trust for the duration of the child's life. No distributions of principal, however, were to be made to any beneficiary prior to the termination, pursuant to the articles of copartnership, of the Stanback Company partnership *204 into which the trustees were authorized to enter. Should a child die prior to the termination of the trust as to him, his share was to be held for the benefit of his issue and distributed to them per stirpes when the youngest of such issue attained the age of 21. Provisions were also made for the death of a child leaving a spouse and no surviving issue and neither surviving spouse nor issue. In the first eventuality one-third of the child's undistributed share of the principal was to be paid over to his spouse. Otherwise, in such eventualities, the deceased child's share was to be merged with the share held for the grantor's surviving children. It was also provided in the agreements that "unless sooner terminated in accordance with the foregoing terms and provisions, each of the trusts created under the terms of this agreement shall terminate upon the expiration of a period of twenty years and eleven months from and after the death of the last survivor of the Grantor's wife and children living at the time of execution of this agreement". The trust agreement was declared irrevocable and the grantor reserved no power to revoke, annul or change any of its provisions. Harris I. *205 Stanback, another brother, was named successor individual trustee. The corporate trustee could resign during the grantor's life upon thirty days written notice, but it could do so only with the permission of the Probate Court of Rowan County, N.C., after the grantor's death. In case of such resignation during his life, the grantor reserved the right to appoint a successor. Otherwise this power was vested in the Probate Court. Compensation for the corporate trustee was provided for based upon percentages of the corpus and income and "for the limited purpose of computing the commissions due said Wachovia Bank and Trust Company on the income of the several trusts, the gross annual income of all trusts herein created shall be combined." On December 29, 1937 a copartnership agreement was made by and between Thomas M. Stanback, party of the first part, Fred J. Stanback, party of the second part, Wachovia Bank and Trust Company and Fred J. Stanback as Trustees for Ada M. Stanback, Thomas M. Stanback, Jr., and William Charles Stanback, parties of the third part; and Wachovia Bank and Trust Company and Thomas M. Stanback, as Trustee for Elizabeth C. Stanback, Fred J. Stanback, Jr., and Nancy *206 Jean Stanback, parties of the fourth part. The agreement provided for the operation of the headache powder business, formerly conducted by the Stanback brothers, under the name "Stanback Company". The partnership's period of existence was to be twelve years commencing on January 1, 1938. After reciting the transfer of certain undivided interests of the old partnership, in trust, the agreement stated that as of the date of its execution the interest of the several partners were as follows: Thomas M. Stanback
38%
Fred J. Stanback
38%
Wachovia Bank and Trust Company and
Fred J. Stanback as Trustees for Ada M.
Stanback
4%
Wachovia Bank and Trust Company and
Fred J. Stanback as Trustees for Thomas
M. Stanback, Jr.
4%
Wachovia Bank and Trust Company and
Fred J. Stanback as Trustees for Wil-
liam Charles Stanback
4%
Wachovia Bank and Trust Company and
Thomas M. Stanback as Trustees for
Elizabeth C. Stanback
4%
Wachovia Bank and Trust Company and
Thomas M. Stanback as Trustees for
Fred J. Stanback, Jr.
4%
Wachovia Bank and Trust Company and
Thomas M. Stanback as Trustees for
Nancy Jean Stanback
4%
TOTAL
100%
Thomas and Fred were declared to be general partners subject *207 to the liabilities provided by law for general partners. The trustees were declared to be limited partners, each limited partner to be entitled to 4% of the profits and to be liable for 4% of the losses from the operation of the business, provided that the liability of each limited partner was not to exceed the value of his capital contribution. The six limited partners each contributed capital of the value of $5,000 while Thomas and Fred's contributions were of the value of $47,500 each. The total capital was thus $125,000. This was the value placed upon the assets of the old partnership business, except that part conveyed to Stanco and the $5,000 contributed by each limited partner, represented the value placed upon the gift in trust of an undivided interest in the old partnership to each beneficiary. Upon liquidation, the distributive shares of the several partners was to be in the proportion of their partnership interests. Any amount advanced to the partnership by any partner in excess of his contribution of capital was to be deemed a loan entitling him to interest thereon but no increase in the share of the partnership profits. Provision was made for the 2% royalty to Thomas as *208 in the case of the old partnership. The general partners were each entitled to draw $1,500 per month in all events but the amount to be withdrawn was to be charged first against his share of the profits for the current fiscal year. An annual audit was to be made and examined and agreed to by all partners after which each partner was entitled to draw out his share of the profits for the preceding fiscal year, less amounts set aside for reserve accounts as hereinafter described. Otherwise the limited partners were not entitled to withdraw profits unless the general partners determined that the condition of the business warranted a distribution to all partners. The agreement provided for the creation of reserves as follows: "The general partners shall have and are hereby given sole authority to determine whether any part of the annual profits are needed as additional working capital or whether any part of such annual profits should be withheld for the purpose of making any improvements, alterations or additions to the plant or whether any part of such profits should be withheld to defray the cost of expansion of the business or of developing new territory. Such decision shall vest *209 solely in the general partners hereinabove named and said general partners may in any year determine that all or any part of the profits for that year or the preceding year (such determination, however, to be made prior to date hereinafter fixed for division and distribution of net profits for the preceding year) are needed for the purposes hereinabove stated, and their decision shall be binding upon all parties in any way interested in this agreement. "Such amount of profits as the said general partners determine to be needed in the business shall be retained in the business and not distributed to the several partners and shall be credited to an appropriate account on the books of the copartnership - such account may be designated as "Reserve For Working Capital", "Reserve for Expansion" or any other appropriate designation selected by the general partners. "Such reserves shall be in addition to the reserves to be regularly maintained by the partnership and representing possible bad debt losses, depreciation on the properties and assets of the copartnership, and other reserves accustomarily carried by like business enterprises. "All of the reserve funds, by whatever name called, *210 may be invested in such manner and in such securities and properties as the general partners may from time to time determine. And such reserves may be increased or diminished in such manner and in such amounts as the said general partners may from time to time determine. "The duties of the partners were defined in the following terms: Each general partner shall "(a) Diligently attend to the business of the partnership and devote his whole time and attention thereto. "(b) Punctually pay his separate debts and indemnify the other partners and the assets of the firm against the same and all expenses on account thereof. "(c) Forthwith pay all monies, checks, negotiable instruments and other properties and assets received by him on account of the firm into the treasury of the firm or into the bank for the account of the firm. "(d) Be just and faithful to the other partners and at all times give to such other partners full information and truthful explanation of all matters relating to the affairs of the partnership and afford every assistance in his power in carrying on the business for the mutual advantage of all the partners. The two general partners shall: "(a) Have *211 complete management and control of the business of the copartnership. "(b) Have the deciding vote with respect to all programs for expansion, development of new territory, withdrawing from territory determined by them to be unprofitable, enlarging, altering and improving the plant and its equipment, building new factories and plants, and the like. "(c) Have complete control over the properties and assets of the copartnership, and shall determine the type and character of investments to be made with surplus funds of the copartnership. "(d) Have the deciding vote as to the amounts to be held in various reserve funds and the amounts to be distributed from time to time to the several partners out of the net profits of the copartnership. "(e) All deeds, bills of sale and contracts shall be executed in the name of the partnership by the two general partners and unless specifically required by law such instruments shall not be executed by the special partners. The special partners shall: "(a) Have no voice in the management and operation of the business of the copartnership. "(b) Advise with the general partners when requested so to do and shall give to the general partners the *212 benefit of their experience and judgment in all matters pertaining to the welfare and successful operation of the copartnership business - PROVIDED, HOWEVER, said special partners shall not have the right to act in any manner which would have the effect of, or which might result in, making them general partners of said partnership." The agreement also contained detailed provisions in connection with the liquidation of the partnership, procedure in the event of the death or insanity of a general partner, the reallocation of holdings of limited partners in the event of the birth of additional children of Thomas and Fred, and arbitration in the event of irreconcilable disputes arising between the partners. Following the creation of the partnership under the agreement noted above, a Certificate of Limited Partnership and a Certificate of General Partners were duly filed for registration with the Register of Deeds, Rowan County, N.C. in compliance with North Carolina law. Public notice of the limited partnership was given by publication for six successive weeks in a newspaper of general circulation within Rowan County. On December 30, 1937 the Stanback brothers each gave 75 shares of *213 his stock in Stanco to the trustees under the December 28, 1937 trusts. The stock was valued at $100 per share for the purpose of computing the corporate trustees' commissions. They surrendered their original certificates for 600 shares and six stock certificates representing 25 shares each were issued in the name of the trustees, one for each beneficiary, and new certificates for 525 shares each were issued in the name of Thomas and Fred, respectively. During the years in question 1205 shares of Stanco stock were outstanding and the ownership thereof did not change. Thomas and Fred each owned 526 shares, their wives individually owned one share each, J. A. Pitts, an employee of Stanback Company held one share, and the balance were held by the trustees as aforesaid. On December 31, 1938, Thomas and Fred each transferred by written assignment to the trustees under their respective trust agreements of December 28, 1937 an undivided 6% interest in the partnership of Stanback Company. Consequently, the Stanback brothers thereafter each owned a 32% interest in the assets, properties and capital of the partnership and the trustees held in trust for each limited partner an additional 6% *214 interest. Upon the formation of the limited partnership, a capital account was set up on the partnership books for each partner. Adjustments were made on January 1, 1939 to reflect the transfer of interests from the general partners to the limited partners as described in the paragraph next above. Net profits were realized by the partnership in 1938 and 1939. A portion of the profits of each year was reserved to finance an expansion and advertising program. The limited partners became entitled to no withdrawals in 1938. In 1939 the trustees withdrew their proportionate part of 1938 profits less the amount reserved. Withdrawals were evidenced by separate checks payable to the bank as trustees for each of the wives and children of the Stanback brothers. The bank has been in the trust business since 1897. It has always kept separate folders and accounts for each trust of which it was trustee, but not for each beneficiary under a single trust. In the instance of the present trusteeship it kept separate folders and accounts for each of the wives and children of the Stanback brothers. A substantial portion of the money received from the Stanback Company in 1939 was transferred to trust *215 principal and invested. Twenty-five shares of Bankers Trust Company capital stock was purchased for each account. Separate certificates were issued in the name of the bank's registered nominee for segregation in each folder. Other investments have since been purchased for the accounts of the Stanback beneficiaries. They have always been identical. The bank has made the investments upon the recommendation of its investment committee and after consultation with the individual trustees. On at least two occasions the bank refused to follow the individual trustees' suggestions as to trust investments. No distributions were made from the trusts during 1938 and 1939. Thomas and Fred have at all times paid the expenses of their households and paid for the support, maintenance and education of their children from their own funds. Federal gift tax returns were filed and gift taxes paid for the years 1937 and 1938 with respect to the partnership interests and Stanco stock transferred in trust. Opinion The principal question common to Docket Nos. 1901 and 1902 is whether the petitioners, as grantors of family trusts, are taxable upon the income thereof under section 22(a) of the Revenue Act *216 of 1938 and the Internal Revenue Code. Thus, we again are called upon to apply what is familiarly known as the doctrine of . By the instant trust agreements, executed December 28, 1937, petitioners, who were brothers, transferred in trust for the benefit of their respective families undivided interests in a partnership theretofore carried on by them as equal partners. Each family consisted of a wife and two minor children. Each petitioner was appointed co-trustee with the Wachovia Bank & Trust Company under his brother's trust agreement. Immediately thereafter a new limited partnership was formed by and between the petitioners as general partners and the trustees for the benefit of each beneficiary as limited partners. The new partnership, as was true of the one which it succeeded, engaged in the business of manufacturing and selling headache powders under the name of Stanback Company. On December 31, 1937 petitioners conveyed to the trustees of the aforementioned trusts minority stock interests in Stanco, a controlled corporation. Respondent held that one trust was formed by each of the above mentioned trust agreements *217 (petitioners contend that three trusts were formed by each agreement) and that the income of each trust amounted to $15,685.78 in 1938 and $33,488.79 in 1939. (Docket No. 1902 pertains only to the year 1939.) These figures are the equal of what the respondent, in Docket Nos. 1899 and 1900, held to be the net distributable income of the Stanback Company for the same years to the trusts as limited partners. Thus, we apprehend it to be respondent's determination that the trusts' sole income for the years in question was derived from the Stanback Company and constituted partnership income. It is this income which respondent seeks to tax to the petitioners in Docket Nos. 1901 and 1902. The Clifford case has become a prolific source of litigation, as is evidenced by the many cases in which the application of its rationale has been sought and contested. Efforts to extend the doctrine to less compelling situations have not met with uniform success. The retention of some degree of control by the grantor of a family trust does not require that the trust income necessarily be considered, for tax purposes, that of the grantor. . *218 The Clifford doctrine merely demands that in such instances special scrutiny be given the terms of the trusts and all the circumstances attendant upon its creation and operation "lest what is in reality but one economic unit be multiplied by devices which, though valid under State law, are not conclusive insofar as section 22 (a) is concerned". Needless to say, each such case can be decided only after a careful balancing of the pertinent factors inherent in the facts of that case alone. . Moreover, in so doing weight is given evidence of control in the grantor inversely with the duration of the trust. Where, as here, the trust under examination is long-term, the control in the grantor must be very substantial to warrant the taxation of the trust's income to him. ; . The terms of the instant trust agreements suggest a complete divestment by petitioners of command over the entrusted property and the income arising therefrom. The petitioners were not trustees under their own *219 trusts, they reserved no power of alteration or revocation, they could receive no part of the trust income, there was no reversion of the corpus to them, they could not substitute other property for that transferred to the trustees, and they could not direct the investment of corpus and income. The corporate co-trustee, the Bank, was disinterested and subject to no domination by the petitioners. It could not be replaced except upon its own act of resignation and after petitioner's death, even this was conditional. Moreover, the evidence indicates that it was the Bank which assumed the active burden of administering the trusts. It kept detailed records and, in the final analysis, determined the investments which should be made with undistributed trust income. It was paid a commission for its services. We can conclude only that the application of the Clifford doctrine is not called for by reason of the terms of the trusts involved here. The agreements compare with those examined in such cases as ; ; ; *220 , and , in each of which the same question was resolved in the taxpayer's favor. Respondent, however, argues that the Clifford doctrine should be applied because of the petitioners' control of the Stanback Company, partnership interests which constituted the principal asset of the trusts and the sole source of the income with which we are here concerned. The gist of his argument is found in this statement taken from his brief. Obviously, the complete and absolute control over the income and assets of the partnership, an undivided interest in which constituted the sole original asset of each trust, and still constitutes the principal asset of each trust, is, in effect, complete and absolute control over the income and corpus of each trust, that is, petitioners by the exercise of such control over the income and assets of said partnership may make the corpus and income of said trusts valuable or valueless, at will. It will be noted that the argument is premised on complete and absolute control over the income and assets of the partnership in the hands *221 of petitioners. But the facts do not warrant a finding that they had such control. Petitioners were simply the managing partners in a limited partnership. As such they had the powers and duties commonly appertaining thereto. They operated the business, directed policy, made determinations respecting the need for reserves, and, by reason of such powers, to an extent controlled the amounts distributed to the limited partners each year. However, the existence of these powers did not give them the very substantial control required to invoke the application of the Clifford doctrine. In rejecting a similar argument made by the Commissioner under analogous facts, we recently said in , While it is true that under the terms of the partnership agreement Scherer, as managing partner, did exercise a large measure of control over the partnership business and had the sole discretion to determine whether the profits of the partnership of any particular year should be distributed to the respective partners or whether such profits should be retained in the partnership business, this discretion did not make him the owner of the *222 shares of income which belonged to the other partners. Any income not distributed had to be credited to the capital accounts of the respective partners and accounted for as such in a final distribution of the partnership assets. So in the present case any income retained in the business would eventually find its way to the limited partners, for upon liquidation they were entitled to their proportionate share in the partnership assets. Moreover, the limited partners had a right to withdraw their share of the preceding year's income after each annual audit, except to the extent that it was set aside in reserve accounts. They in fact did so. We can find no basis for respondent's assertion that petitioners could, through control of the partnership, make the corpus and income of the trusts valuable or valueless, at will. In this connection it is well to note that any mismanagement of the partnership business would affect similarly petitioners' own interests proportionately with those of the limited partners. Doubtlessly this would constitute a restraint upon any action in derogation of the best interests of all. Finally, we can not assume that petitioners would so lightly respect the *223 fiduciary obligations and attendant liabilities imposed upon them as managing partners and trustees as to purposely render the corpus and income of the trusts worthless. We conclude that petitioners in Docket Nos. 1901 and 1902 are not taxable on the income of the trusts respectively created by them by reason of section 22 (a) of the Revenue Act of 1938 and the Internal Revenue Code. As an alternative contention to that disposed of above, respondent urges that the trust income is taxable to petitioners under section 167 (a) of the applicable revenue laws, as interpreted and applied by , subject to the limitation provided by section 167 (c) as added by section 134 (a) of the Revenue Act of 1943 [1] and made conditionally retroactive by section 134 (b) (2) [2] of the 1943 Act. The R. Douglas Stuart trusts, under examination in the Stuart case, were trusts for minors by the terms of which the trustees, who had no adverse interests, were authorized in their discretion to devote trust income to the "education, support and maintenance" of the minors. The Supreme Court held that under such a provision the possibility of *224 the use of the income to relieve the grantor, pro tanto, of his parental obligation was sufficient to require the entire income to be taxed to the grantor regardless of its actual use. Petitioners seek to distinguish the instant trusts on the ground that they are not expressly for the "support, maintenance and education" of their children. We do not think this distinction calls for a contrary conclusion in respect of the income from that portion of the trusts held for the benefit of the children, all of whom were minors during the years in question.
*225 Notwithstanding the absence of the words "support, maintenance and education", it appears that the trustees here were authorized to apply the income and, if necessary, the principal of a child's portion to effectuate these purposes. In each agreement it was provided that if by reason of serious illness or misfortune or other emergency, as to the existence of which the trustees should be the sole judge, the net income payable to or applicable "for the benefit of any beneficiary", supplemented by income available from other sources, should not be sufficient in the judgment of the trustees "adequately to meet the reasonable needs of such beneficiary, in his or her station of life" then the trustees could apply part of that beneficiary's share of the principal to meet such needs. The inclusion of this authority to invade corpus certainly contemplates, impliedly if not expressly, that the income could be used to meet the needs of the minors in their station of life, for the principal was to be used only in instances where the income was insufficient for the purpose. The "needs" of the minors "in their station of life" clearly embraces financial requirements for support, maintenance and *226 education, all of which the respective petitioners are legally bound to provide. Hence, the rule of the Stuart case applies. Obviously, the trustees had no adverse interests in the income. We hold that the income of the trusts is taxable to the respective petitioners-grantors, under section 167 (a). (on appeal to C.C.A. 2 [1]), but only to the extent of the amount thereof attributable to the children's benefit ( (on appeal to C.C.A. 2 [2]). Section 134 (a) of the Revenue Act of 1943 adds subsection (c) to section 167 which modifies the rule announced in the Stuart case as to all taxable years subsequent to December 31, 1942 by limiting its application to such part of the trust income as is used for the support or maintenance of a minor beneficiary. Moreover, the modification is made conditionally retroactive by section 134 (b) (2) of the Revenue Act of 1943. Here the evidence establishes *227 that none of the trust income was used for the support, maintenance and education of the petitioners' children. If the parties comply with the condition upon which such retroaction depends, effect will be given under Rule 50 to such retroaction upon our holding that a portion of the income of the trusts is taxable to the petitioners-grantors under section 167 (a). If the petitioner in Docket No. 1901 and 1902 comply with the condition mentioned above, the trust income otherwise taxable to them will not be so taxable. Assuming that they will take advantage of the privilege thus accorded them, we deem it proper to resolve the common question raised in Docket Nos. 1899 and 1900, the trust cases. This question is whether each of the trust agreements of December 28, 1937 created a single trust, as contended by respondent, or three trusts, as contended by the petitioners in Docket Nos. 1899 and 1900. Petitioners, in the alternative, urge that in any event each instrument created two trusts, one for the grantor's wife and one for his children. Returns have been filed and taxes paid for the years in question on the theory that each agreement established three separate trusts. It is clear *228 from uncontradicted testimony that the respective grantors intended to create one trust for his wife and one for each child. This was part of the plan and we have so found. The attorney employed to draw the trust agreements advised that their effect was the formation of three separate trusts by each. The articles of copartnership, expressly mentioned in the trust instruments, provided for the participation of six limited partners, consisting of the trustees in behalf of each of the wives and children. Each limited partner was said to have contributed to the partnership and a capital account was, in fact, set up and maintained for the six such partners. This is corroborative of the intent to create separate trusts. Evidence aliunde may be received to aid in the construction of legal instruments, although not to contradict the plain and unambiguous language used. . Hence, we must examine the terms of the agreements themselves to determine whether the respondent must be sustained regardless of the contrary intent otherwise manifested. Respondent places much emphasis on the several references to "the trust estate," "part *229 or share of this trust estate," and "this trust," as they appear in the two agreements. He also points to the provisions admitting after born children to the "class of beneficiaries." He argues that these circumstances clearly and unmistakably demonstrate an intent to establish single trusts with multiple beneficiaries. The trouble with this argument is that the agreements contain language and clauses which are fully as persuasive toward the conclusion that the grantors intended to create a separate trust for each beneficiary. For example, the distributive provisions commence with the clause, "The trusts herein created"; it is stated that unless sooner terminated "the trusts created under the terms of this agreement" shall terminate so as not to violate the rule against perpetuities; and, with respect to the payment of trustee commissions it is provided, "for the limited purpose of computing the commissions due said Wachovia Bank and Trust Company on the income of the several trusts, the gross annual income of all trusts herein created shall be combined." Here, as in the case of , the original trust estate *230 of each of the beneficiaries was an undivided interest in property. This circumstance was there believed by the Sixth Circuit Court to be a fact explanatory of the occasional departure from the plural to the singular in connection with the language used in the trust declaration. So it is here. The Court went on to say in the MacManus case, "The concept predominently in the mind of the draftsman in one recital may have been the plural trusts, in another the unitary character of the corpus. Upon such finely woven distinctions the clearly expressed purpose of the actual trustor is not to be set aside." This language is peculiarly apposite to the present case. In any event, this is not an instance where the language of the instrument is so clear and unambiguous that evidence aliunde can not be resorted to in aid of construction. On the contrary, we think it to be one where such evidence is especially relevant. Accordingly, we give it consideration. Furthermore, it is undisputable that the trustees construed each trust agreement as establishing three distinct trusts. The Bank, which assumed the active administrative burden, set up separate accounts and segregated additions to *231 corpus in separate folders for each of the beneficiaries. Its consistent policy was to adopt this practice of segregation only in cases of separate trusts and not in cases of multiple beneficiaries of a single trust. A similar construction of similarly questioned trust agreements was regarded as of some significance in , and . For the reasons mentioned and others, such as the individual treatment of the equal shares of the entrusted property for purposes of distribution, upon the prior death of each beneficiary and in the event of the invasion of corpus, we conclude and hold that three separate trusts were created by the terms of each of the December 28, 1937 trust agreements, all in keeping with the grantors' purpose so to do. See ; . Decisions will be entered under Rule 50. Footnotes
1. SEC. 134. TRUSTS FOR MAINTENANCE OR SUPPORT OF CERTAIN BENEFICIARIES. (a) Income for Benefit of Grantor. - Section 167 (relating to income for benefit of grantor) is amended by adding at the end thereof the following subsection: "(c) Income of a trust shall not be considered taxable to the grantor under subsection (a) or any other provision of this chapter merely because such income, in the discretion of another person, the trustee, or the grantor acting as trustee or cotrustee, may be applied or distributed for the support or maintenance of a beneficiary whom the grantor is legally obligated to support or maintain, except to the extent that such income is so applied or distributed. In cases where the amounts so applied or distributed are paid out of corpus or out of other than income for the taxable year, such amounts shall be considered paid out of income to the extent of the income of the trust for such taxable year which is not paid, credited or to be distributed under section 162 and which is not otherwise taxable to the grantor." ↩
2. (b) TAXABLE YEARS TO WHICH APPLICABLE. - * * * * *
(2) Retroactive effect. - The amendments made by subsection (a) shall also be applicable with respect to all taxable years to which such amendments are not made applicable under paragraph (1), in the same manner as if such amendments had been a part of the revenue laws applicable to such taxable years, but only if there are filed with the Commissioner (in accordance with regulations prescribed by him with the approval of the Secretary) at such time and by such persons as may be prescribed under such regulations, signed consents that there shall be paid, at such time as the Commissioner may prescribe, all of the taxes under Chapter 1 of the Internal Revenue Code or under the corresponding provisions of prior revenue laws which would have been paid for the taxable years concerned if such amendments had been a part of the revenue laws applicable to such taxable years.↩
1. Subsequently vacated and remanded by CCA-2,. For supplemental Tax Court opinion see 4 TCM -, CCH. ↩
2. Affirmed by CCA-2, ,.↩